UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NEW WORLD MUSIC COMPANY (LTD),
JAMES PATRICK PAGE (AKA JIMMY
PAGE), ROBERT PLANT, JOHN
BALDWIN (AKA JOHN PAUL JONES),
GLADYS MUSIC, FAMOUS MUSIC LLC,
SUCCESSOR-IN INTEREST TO FAMOUS
MUSIC CORPORATION, DYING EGO
MUSIC, DOOD MUSIC, SEVEN PEAKS
MUSIC, WB MUSIC CORP., DESMUNDO
MUSIC and DESTON MUSIC,

    Plaintiffs,

v.                                    Case No.  8:07-cv-398-T-33TBM

TAMPA BAY DOWNS, INC., STELLA
THAYER, AND ROBERT L.
CASSANESE,

    Defendants.
_____/


TAMPA BAY DOWNS, INC., STELLA
THAYER, AND ROBERT L.
CASSANESE,

    Third Party Plaintiffs,

v.


RADIO DISNEY GROUP, LLC

    Third Party Defendant.
_____/

**<u>ORDER</u>**

    This matter comes before the Court pursuant to Plaintiffs'

Motion for Summary Judgment against Defendants (Doc. # 39),

filed on September 15, 2008, and Defendants Stella Thayer and

Robert Cassanese's Motion for Summary Judgment (Doc. # 46),

filed on September 16, 2008, and the responses thereto.  For the reasons stated below, the Court grants both motions in part and denies them in part.

## I.   Background

This case arises from the playing of six copyrighted musical compositions on the premises of Tampa Bay Downs, Inc. ("TBD"), on February 19, 2006.   Plaintiffs assert that Defendants infringed their copyrights by playing four copyrighted compositions at a TBD Kids and Family Day event and by transmitting two compositions to patrons utilizing rented television carrels.

### A.   Tampa Bay Downs

TBD is a pari-mutuel wagering facility.[1]   (Doc. # 56, Dep. Peter Berube at 5:13-15.)  Open seven days a week, TBD holds live thoroughbred races during the December through May racing season.   (Id. at 6:6-15).   In addition, simulcast wagering is offered year-round, whereby patrons may view and place bets on races and Jai-Alai events taking place at other venues across America.  (Id. at 6:16-7:1.)  TBD broadcasts its live races and simulcasted races through an extensive network

---

[1]Pari-mutuel wagering is a form of wagering where the players play against each other, and the house has no stake in the outcome of the games.  (Doc. # 56, Dep. Peter Berube at 5:18-6:3.)

live races and simulcasted races through an extensive network

of at least 715 televisions located throughout the grounds. (Id. at 35:19-37:21; Doc # 55 at 21:20-22:10.)

TBD's grounds can be divided into four areas, the golf clubhouse, the clubhouse, the grandstand, and the picnic pavilion. (Doc. # 56 at 17:1-13.) During the racing season, TBD charges $2.00 for admission into the grandstand area, which is considered the general admittance area, and $3.00 for admission into the clubhouse area. (Doc. # 55 at 20:17-23.) The picnic pavilion is accessible after admission into either the grandstand or clubhouse areas. (Id. at 18:5-8; Doc. # 40, Ex. A at 12.)

Patrons are unable to adjust the channel or volume on the majority of the televisions on TBD's grounds. (Doc. # 56 at 35:16-37:21.) However, there are 215 televisions, located in the clubhouse, the restaurant, and the grandstand's private boxes, where patrons may select various channels and adjust the televisions' volume. (Doc. # 40 at 14; Doc. # 55 at 21:22-22:10; Doc. # 56 at 36:12-37:13.) The television carrels in the clubhouse can be rented for $3.00 per day and the private boxes can be rented for $900 per year or $2.00 per person per day. (Doc. # 40 at 12; Doc. # 56 at 40:4-14.) Four of the alleged infringements occurred in the picnic pavilion and the other two alleged infringements occurred in

3

the clubhouse's television carrels.  (Doc. # 44 at 12-15, 22-25.)

     With regard to the individual defendants, Cassanese is TBD's vice president of operations (Doc. # 56 at 23:13-18), and Thayer is president and a majority owner of the closely-held company.  (<u>Id.</u> at 23:6-12; Doc. # 39-2, Ex. 1 at ¶ 8; Doc. # 39-2, Ex. 1 at ¶ 8; Ex. 4 at ¶ 8.)  As president, Thayer has primary responsibility for the control, management, operation, and maintenance of TBD's corporate affairs, including the direction and supervision of the employees at TBD and the determination of the music policy employed at the establishment.  (Doc. # 39-2, Ex. 2 at ¶ 13; Ex. 5 at ¶ 13.) Cassanese oversees the racing services and the general maintenance of TBD's more than 500 acres of land and numerous buildings.  (Doc. # 56 at 23:20-22; 63:16-64:4.)  Peter N. Berube, vice president and general manager of TBD, stated in his deposition that Cassanese's role is primarily limited to the racing side of TBD's operations. (<u>Id.</u> at 24:6-7.)  Berube attested that Thayer has the authority to restrict access to all televisions at TBD and to prevent any hired disc jockeys from broadcasting on the grounds of TBD.  (Doc. # 56 at 53:1-10.)

**B.    ASCAP**

The American Society of Composers, Authors, and Publishers ("ASCAP") is an unincorporated membership association of more than 330,000 members who write and publish musical compositions. (Doc. # 45 at ¶ 3.) Plaintiffs are all members of ASCAP. (<u>Id.</u>) ASCAP holds non-exclusive licenses to authorize non-dramatic public performances of its membership's works. (<u>Id.</u>) ASCAP's licensees include television networks and stations, radio networks and stations, restaurants, nightclubs, hotels, and many other types of music users. (<u>Id.</u>)

**C.    ASCAP Contacts TBD**

When ASCAP learned that TBD was using music at their establishment without a license, an ASCAP representative sent a letter to Thayer and Margo Flynn, vice president of publicity, on November 5, 2004. (Doc. # 45-4, Ex. A at 18.) In the letter ASCAP explained, "To publicly perform copyrighted music legally, you must obtain permission from the copyright owners or their representatives, such as ASCAP." (<u>Id.</u>) ASCAP's initial contacts with TBD invited the company to enter a licensing agreement to secure such permission, and later correspondence warned TBD that they were at risk of liability under the Copyright Act for unauthorized public

5

performance of copyrighted musical compositions in the ASCAP repertory.  (Doc. # 45 at 3-4.)   TBD ignored all ASCAP's efforts to secure licensing, including its most recent letter dated May 18, 2006.  (<u>Id.</u>; Doc # 56 at 29:2-7.)  By way of explanation, TBD representative Berube atterts that, after conducting personal research and discussing the matter with counsel for TBD, it was determined that TBD was in full compliance with copyright laws.  (Doc. # 56 at 73:8-21.)

After TBD's continued failure to respond to ASCAP's demands, ASCAP referred the matter to its legal department.  (Doc. # 45 at ¶ 6.)  Thereafter, ASCAP hired Walter Busse, an independent investigator, to determine whether unauthorized performance of ASCAP member's copyrighted songs was taking place at TBD.   (<u>Id.</u> at ¶ 10.)  Busse prepared a report detailing his observations during his four-hour visit to TBD on February 19, 2006, including the title of each song he heard performed and the time and manner of the performance.  (<u>Id.</u>; Doc. # 40, Ex. A .)

That day, TBD was hosting a Kids and Family Day in TBD's picnic pavilion.  (Doc. # 40, Ex. A at 22.)  According to Busse's report,

> Three  [R]adio  Disney  personalities  presented
> interactive  family/kids  activities,  played  games,
> contests and giveaways while announcing and playing

> music through [a] PA system. . . . Music was
> playing continuously (with occasional pauses,
> starts, and stops for "musical chairs" type games)
> from our arrival at [the picnic pavilion] at
> 11:12am until promo was ended at 2:18. . . . CD's
> played included store bought "Radio Disney Jams"
> series CDs as well as homemade burnt CD-Rs with
> computer printed song [lists] . . . .

(Id. at 12.)  While at the event, Busse reported hearing the

following four musical compositions for which ASCAP held

licenses: "Can't Help Falling in Love," "Axel F," "Beautiful

Soul," and "Because You Live."  (Doc. # 40 at ¶ 6; Doc. # 40,

Ex. A at 17-18.)

At the conclusion of the Kids and Family Day Event, Busse

proceeded to a clubhouse television carrel that he had rented.

(Doc. # 44 at 14:18-15:1.)  Busse turned on the television and

selected TV Fox.  (Id. at 20:18-21.)  While watching, Busse

heard two musical compositions in ASCAP's repertory.  First,

Busse saw a Cadillac commercial that played the composition

"Rock and Roll" in the background.  (Id. at 20:10-15.)

Second, Busse heard the musical composition "Rhapsody in Blue"

in the background of another commercial.  (Id. at 22:16-19.)

**D. Procedural Posture**

Based on Busse's investigation and TBD's failure to

obtain a license from ASCAP, Plaintiffs brought suit against

Defendants for six counts of copyright infringement under the

7

Copyright Act, 17 U.S.C. §§ 106(4), 501(a).  (Doc. # 1.)  Each count represents one of the musical compositions Busse heard during his February 19, 2006, investigation.  Plaintiffs seek statutory damages, injunctive relief, and attorney's fees.  On October 23, 2007, Defendants filed a third-party complaint against Radio Disney (Doc. # 17), asserting claims for indemnity and contribution in the event that they are found liable for copyright infringement.

Plaintiffs now move for summary judgment, asserting that the undisputed material facts demonstrate that Defendants committed copyright infringement under 17 U.S.C. §§ 106(4), 501(a).  (Doc. # 39.)  Plaintiffs seek a permanent injunction preventing Defendants from further infringement of Plaintiffs' copyrights and statutory damages in the amount of $90,000.[2] Defendants Thayer and Cassanese seek summary judgment as to their individual liability, arguing that the record evidence does not support a finding that Thayer or Cassenase were sufficiently involved in the allegedly infringing conduct to subject them to vicarious or contributory liability for that

---

[2] Pursuant to Local Rule 4.18, Middle District of Florida, Plaintiffs have indicated their intention to file a claim for attorney's fees and costs within fourteen days of the entry of an award of judgment in this case.  (Doc. # 39 at 2 n.1.)

conduct.  (Doc. # 46.)

## II.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260

(11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)).  However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only

proper, but required.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

**III. Analysis**

    **A.   Plaintiffs' Summary Judgment Motion**

Plaintiffs bring suit under the Copyright Act, 17 U.S.C. §§ 101-801 (2006).  The Act provides in relevant part as follows: "[T]he owner of copyright under this title has the exclusive rights[,] . . . in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly." 17 U.S.C. § 106(4).  Furthermore, the Act provides that, "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright . . . ." 17 U.S.C. § 501(a).

To prevail on a claim for copyright infringement, Plaintiffs must prove the following three elements: "(1) ownership of a valid copyright in the work and (2) public performance of the work by the defendant (3) without authorization from the plaintiff." M.L.E. Music Sony/ATV Tunes, LLC. v. Julie Ann's, Inc., Case No. 8:06-cv-1902-T-17EAJ, 2008 WL 2358979, at * 2 (M.D. Fla. June 9, 2008) (citing Morley Music Co. v. Café Continental, Inc., 777 F.

Supp. 1579, 1582 (S.D. Fla. 1991); Nick-O-Val Music Co. v. P.O.S. Radio, Inc., 656 F. Supp. 826, 828 (M.D. Fla. 1987)).

Defendants do not dispute Plaintiffs' ownership of a valid copyright.  Regarding the four compositions played by the Radio Disney employees, Defendants appear to concede the public performance element, as they limit their argument to whether the Disney employees were authorized to perform the compositions.  As to the two musical compositions heard on the clubhouse television, Defendants dispute only the public performance prong of the infringement test.

**1. Liability under the Copyright Act**

**a.   Live Performances**

Where a copyright infringement case involves live performances by musicians or disc jockeys, the owner of the establishment may be subject to vicarious liability for the infringement if it has "the right and ability to supervise the infringing activity and also has a direct financial interest in such activities."  Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971). However, secondary liability cannot be imposed without first establishing direct infringement by the performer.  UMG Recordings, Inc. v. Sinnott, 300 F. Supp. 2d 993, 997 (E.D.

Cal. 2004) (citing A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 n. 2 (9th Cir. 2001)).

Defendants do not assert that TBD lacked either the requisite ability to supervise the infringing activity or a direct financial interest in the activity. Instead, Defendants argue that Plaintiffs have failed to meet their burden in establishing that the direct infringers in this case, employees of Radio Disney, were unauthorized to perform the copyrighted compositions. (Doc. # 50 at 5.)

In their summary judgment motion, Plaintiffs address the direct infringement by asserting that the live performances at TBD "were neither broadcasts of Radio Disney's over-the-air broadcast signal, nor a simulcast transmission of that signal." (Doc. # 39 at 7-8.) Plaintiffs further contend that Radio Disney's license with ASCAP only covers the above-stated radio broadcasts or transmissions and, because the performances on the day in question did not fall into either category, those performances were not covered by Radio Disney's license with ASCAP. (Id. at 8, n. 15.)

Defendants argue that Plaintiffs have failed to meet their burden of proof on the issue of authorization because they have offered no evidence to establish that Radio Disney's ASCAP license did not cover the live performances at issue.

13

(Doc. # 50 at 4-5.)  Plaintiffs reject this argument, claiming that it is Defendants who bear the burden of pleading and proving the affirmative defense of license.  (Doc. # 39 at 2-3.)

Although the issue is not well settled, there is precedent to support Plaintiffs' position that Defendants bear the burden of establishing authorization of the direct infringer in a case involving vicarious liability.  In <u>M.L.E. Music Sony/ATV Tunes, LLC v. Julie Ann's, Inc.</u>, a nightclub owner was sued for copyright infringement based on a hired karoake operator's performance of copyrighted songs.  2008 WL 2358979, at * 1.  It was undisputed that the defendants lacked authorization to perform the songs, but the defendants claimed that summary judgment for plaintiffs was inappropriate because the plaintiffs had failed to show that the owner of the karoake machine was operating without a valid license from ASCAP.  <u>Id.</u> at * 2.  The court rejected this argument and granted the plaintiffs' motion for summary judgment, holding that the "[d]efendants have the burden of proving the existence of authorized use and should have asserted the affirmative defense at the time they filed their answer." <u>Id.</u> at * 4 (internal citations omitted) (citing to <u>I.A.E., Inc. v. Shaver</u>, 74 F.3d 768, 775 (7th Cir. 1996)).  The court found

14

that no genuine issue of material fact existed where the defendants merely raised an unsupported allegation that the karaoke operator had obtained a license to perform the songs. Id.

Here, it is also undisputed that Defendants failed to enter into a licensing agreement with ASCAP authorizing public performance of Plaintiffs' musical works. In addition, Defendants did not raise license as an affirmative defense in their answer to the complaint and they have not offered any proof that Radio Disney's ASCAP license authorized the performances at issue. Thus, applying the reasoning of M.L.E. Music, Defendants have not provided evidence that raises an issue of material fact sufficient to overcome summary judgment.

In support of their position that Plaintiffs bear the burden of proof on this issue, Defendants cite to Polygram International Publishing, Inc. v. Nevada/TIG, Inc., 855 F. Supp. 1314 (D. Mass. 1994). In Polygram, the plaintiffs alleged copyright infringement based on performances of copyrighted music by exhibitors and a disc jockey at a trade show. Id. at 1317. The parties stipulated that the defendants were not authorized to perform the works, but the

15

record was silent as to the exhibitors and the disc jockey's authorization to do so.  Id. at 1320.

Although the Polygram court concluded that, on the facts presented, the plaintiff had the burden of proof on the issue of authorization, it conceded that the burden of production may shift to the defendant once a plaintiff alleges or makes some showing that the performers lacked authorization to perform.  Id. at 1322-23.  Because the plaintiffs in that case had failed to allege any direct infringement, the court declined to decide whether some kind of showing by plaintiffs would have been enough to shift the burden of production on this issue to the defendants.  Id. at 1323.

This Court declines to apply the holding in Polygram to the facts here because Plaintiffs have not only alleged lack of authorization in their complaint and in their summary judgment motion, they have pointed to evidence in the record to support their allegation.  Plaintiffs assert that Radio Disney's licensing agreement authorizes performances by way of simulcast or over-the-air broadcasting of its signal only. Independent investigator Busse's report, submitted by Plaintiffs, reflects that the Radio Disney disc jockeys were playing CDs, rather than broadcasting any live Radio Disney signals.  In addition, Plaintiffs offer the interrogatory

16

response of Radio Disney which attests that Radio Disney employees were playing music CDs for TBD patrons at the Kids and Family Day event and "did not 'broadcast' or 'simulcast' the music played at the track." (Doc. # 39-3 at 4.)

Under these facts, and in accord with the holding in M.L.E. Music, the Court finds that Plaintiffs have met their initial burden of proof in showing that the live performances of copyrighted musical compositions at TBD's Kids and Family Event were unauthorized. Thus, the burden of persuasion has shifted to Defendants to show that its hired performers were licensed or authorized to perform the compositions on the date in question. Defendants have had ample time to investigate Radio Disney's licensing arrangements and the manner in which the disc jockeys performed at TBD. Still, they have failed to produce any evidence to rebut Plaintiffs' assertions that Radio Disney's licensing agreement did not cover their contracted performances at TBD.

Defendants did not plead license as an affirmative defense and their current allegations – without any record evidence in support – that the Radio Disney disc jockeys may have been authorized to perform is not sufficient to overcome a motion for summary judgment. The Court finds that, under the facts of this case, Defendants have failed to raise any

17

genuine issue of material fact as to TBD or its hired performers' authorization to play Plaintiffs' copyrighted works.   As this was the only element in dispute, the Court therefore finds as a matter of law that Defendants' live performances of four copyrighted compositions at its Kids and Family Day Event constituted infringement of Plaintiffs' copyrights.

### b.   Television Performances

The two remaining counts for copyright infringement stem from the musical compositions heard by ASCAP's private investigator in one of the clubhouse's rented television carrels.  Defendants do not dispute the elements of ownership and authorization as to these counts.  Therefore, the Court need only determine whether the performance of these songs constituted a "public performance" under the Copyright Act.

Under the Act, to "perform" a copyrighted work means "to recite, render, play, dance, or act it, either directly or by means of any device or process . . . ." 17 U.S.C. § 101.  The Court finds that the two compositions heard by Busse on the television were "performed" as that term is defined in the Act, and Defendants do not argue otherwise.

Defendants' arguments are confined to Plaintiffs' characterization of the performance as "public" in nature. According to the Act, to perform a work "publicly" means:

> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or
> (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

Id.

The public-place clause, or clause number one above, is "written in the disjunctive, and thus two categories of places can satisfy the definition of 'to perform a work publicly.'" Columbia Pictures Indus., Inc. v. Redd Horne, Inc., 749 F.2d 154, 158 (3d Cir. 1984). The first category is "a place open to the public." Id. The second category is "determined by the size and composition of the audience" and is commonly referred to as a "semi-public place." Id. The third avenue for establishing that a work has been publicly performed is under clause number two, the "transmit clause," which requires only that the performance be transmitted to the public by a device or process.

19

It is clear that TBD's broadcast of Plaintiffs' musical compositions qualifies as a public performance.  First and foremost, TBD is unquestionably open to the public.  Any member of the public can enter the clubhouse and rent a television carrel for a small fee.  Contrary to Defendants' argument on this issue, the fact that the television broadcasts are viewed in individual carrels within the public space has no effect on their characterization as public performances.  See Columbia Pictures, 749 F.2d at 159 (finding that the viewing of copyrighted films in private booths in a public establishment still falls within the public-place clause because "[t]he relevant 'place' within the meaning of section 101 is each of [defendant's] two stores, not each individual booth within each store").

These carrels have been described by TBD as "individual work stations" within a larger "carrel area" in the clubhouse.  (Doc. # 56 at 36:14-20.)  They are not fully enclosed and the Plaintiffs' investigator likened them to the carrels one would find in a library.  (Doc. # 44 at 14:18-24.)  If the volume of the television is turned up loud enough, TBD has conceded that it may be heard by patrons outside of the individual carrel.  (Doc. # 56 at 39:1-11.)  Thus, the structure of the carrels themselves suggests a public quality to the transmissions.

20

The Court's conclusion that TBD's activities constitute public performances is further supported by the transmit clause, which specifically provides that the members of the public who receive the transmission may be "in the same place or in separate places."  17 U.S.C. § 101.  Court's have consistently found that transmissions are public performances even when they are received by small numbers of people at a time.  See e.g. Columbia Pictures, 749 F.2d at 159 (holding that "transmission of a performance to members of the public, even in private settings such as hotel rooms or [viewing rooms], constitutes a public performance"); On Command Video Corp. v. Columbia Pictures Indus., 777 F. Supp. 787, 788-90 (N.D. Cal. 1991) (holding that a system whereby movie videotapes are electronically delivered to hotel guest rooms was a public performance under the transmit clause).

Defendants attempt to exempt themselves from liability for the television performances under the Copyright Act's "home-system defense."  Section 110(5)(A) of the Act provides that certain communications of a transmission that embodies a performance of a copyrighted work by means of the "public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes" is not copyright infringement unless (1) there is a direct charge to view or

hear the transmission, or (2) the transmission is further transmitted to the public.  This exemption was created to protect small commercial establishments that utilize home-type receivers from liability under the Copyright Act.  Int'l Korwin Corp. v. Kowalczyk, 665 F. Supp. 652, 657-58 (N.D. Ill. 1987), aff'd 855 F.2d 375 (7th Cir. 1988).

In this case, TBD charges a fee to access the television carrels and the private boxes containing televisions.  These televisions have the capability to be adjusted by patrons to receive certain channels, including the TV Fox station accessed by Busse, that perform copyrighted musical compositions.  The Court finds TBD is not entitled to the exemption based on this ground alone.  However, even if the fee for renting the carrels was not considered a direct charge to use the television sets, the Court finds several other grounds for denying Defendants the benefit of the home-style defense.

In the absence of a direct charge, courts generally require a showing of three elements to apply the home-system defense.  "First, the receiving apparatus must be of the kind commonly used in private homes.  Second, the performances must not be 'further transmitted' to the public.  Third, the business must be a small commercial establishment."  U.S.

Songs, Inc. v. Downside Lenox, Inc., 771 F. Supp. 1220, 1227 (N.D. Ga. 1991) (citing Int'l Korwin, 855 F.2d at 378).  TBD fails on all three elements.

First, TBD's apparatus is not of a type commonly used in private homes.  This element requires consideration of "the entire system and the context of its use, rather than focusing on individual components."  Hickory Grove Music v. Andrews, 749 F. Supp 1031, 1037 (D. Mont. 1990).  TBD receives its television signal via four satellite dishes.  (Doc. # 55 at 26:9-14.)  The signal is then routed through a system of receivers in the third floor "television room," where it is descrambled and sent to the 715 televisions throughout TBD's premises via coaxial wiring.  (Id. at 23:13-22, 25:6-24.)  The wiring for this system was installed throughout the TBD facility by the television vendor.  (Id.)  Although some of these individual components may be found in area homes, TBD's extensive television system is clearly a commercial system that bars application of the home-style exemption.  See Hickory Grove, 749 F. Supp. at 1038 (citing to numerous cases holding that a system of recessed ceiling speakers attached to a receiving apparatus by a substantial length of hidden wiring is not a "home-type" system under the exemption).

23

Second, TBD transmits the television signal from the receiving room to numerous televisions throughout the premises.  The Copyright Act defines "to transmit" as meaning "to communicate [a performance] by any device or process whereby images or sounds are received beyond the place from which they are sent."  17 U.S.C. § 101.  Courts considering this issue have interpreted "further transmission" to include "any dispersal of sound from a point of reception through a restaurant or other establishment."  U.S. Songs, 771 F. Supp. at 1227 (citing Hickory Grove, 749 F. Supp. at 1038).  Thus, TBD fails on the further transmission element as well. Finally, TBD's facilities cannot by any stretch of the imagination be characterized as a small commercial establishment and, in fact, TBD does not attempt to argue that it qualifies as such.

For these reasons, the Court finds that TBD's live television broadcast featuring Plaintiffs' copyrighted works constitutes a public performance subjecting TBD to liability for these two counts as well.  In addition, TBD's arguments regarding its qualification for the home-style defense are unpersuasive.  Thus, the Court finds no genuine issue of material fact to preclude summary judgment as to Plaintiffs' six counts of copyright infringement.

24

### 2.   Injunctive Relief

"Any court having jurisdiction of a civil action arising under [the Copyright Act] may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The Eleventh Circuit has explained that an injunction is appropriate when there is "a past infringement and a substantial likelihood of future infringement." <u>Pacific and S. Co., Inc. v. Duncan</u>, 744 F.2d 1490, 1499 (11th Cir. 1984).

TBD states that it has not obtained a license because it concluded, after independent investigation and consultation with legal counsel, that its performances were not unauthorized. (Doc. # 50 at 15.)  It further contends that it has stopped using live musical performances and that it will either obtain a license or alter its television system if the current use is deemed a public performance. (<u>Id.</u>)  The Court finds TBD's arguments unpersuasive.

"[I]t is entirely too easy for an adjudicated infringer to claim a reformation once the specter of a permanent injunction looms near." <u>Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.</u>, 518 F. Supp. 2d 1197, 1221 (C.D. Cal. 2007). As the Ninth Circuit has noted, "[C]ourts must be particularly skeptical about attaching any significance to contrition under

25

protest." <u>S.E.C. v. Koracorp Indus., Inc.</u>, 575 F.2d 692, 698 (9th Cir. 1978).

The record establishes that Defendants received numerous letters from ASCAP warning them that they needed to obtain a license, yet they failed to obtain a license and they continued to engage in the infringing activities.  In his deposition testimony, TBD representative Berube admitted that TBD failed to discontinue live performances until well after this suit was initiated on March 5, 2007, and that the television broadcasts have continued as before.[3]  Under these circumstances, the Court finds that there is a substantial likelihood that TBD will continue to infringe copyrighted works unless an injunction is issued.  Where infringers ignore ASCAP's warnings and must be sued to enforce the rights of copyright holders, courts routinely grant injunctive relief to prevent further infringement "unless and until [the infringer] obtains the appropriate license." <u>Morley Music</u>, 777 F. Supp. at 1583; <u>see also</u> <u>Boz Scaggs Music v. KND Corp.</u>, 491 F. Supp. 908, 914 (D. Conn. 1980); <u>M.L.E. Music</u>, 2008 WL 2358979, at * 4; <u>Nick-O-Val Music</u>, 656 F. Supp. at 828; <u>Blue Seas Music,</u>

---

[3] Berube attested that there have been no further public performances after December 7, 2007, except for the Direct TV transmissions that TBD maintains do not require licensing. (Doc. # 55 at 39:21-40:9.)

<u>Inc. v. Fitness Surveys, Inc.</u>, 831 F. Supp. 863, 865 (N.D. Ga. 1993); <u>U.S. Songs</u>, 771 F. Supp. at 1229.

Although Berube has testified that, based upon his own research and consultation with counsel, TBD was in compliance with copyright laws, he fails to specify any sources of information or legal theories on which TBD relied for this conclusion. (Doc. # 56 at 73:8-75:14.)  Plaintiffs have offered a letter dated July 7, 2005, which was sent by ASCAP to TBD counsel in response to TBD's request for information regarding the nature of their alleged infringement. (Doc. # 45-3 at 8-9.)  The letter indicates that the televisions in TBD's clubhouse allow multi-channel capability and when the volume is turned up the music heard on those televisions is considered a public performance of copyrighted musical compositions in violation of the Copyright Act. (<u>Id.</u>)  There is no evidence that TBD responded to those allegations in an attempt to explain their legal position or that they took any steps to resolve the matter.  Thus, the Court remains unpersuaded that TBD would refrain from further infringement without the deterrent of an injunction in place.

Accordingly, the Court finds that a permanent injunction is appropriate in this case.

27

### 3.    Statutory Damages

Pursuant to the Copyright Act, "the copyright owner may elect . . . to recover, instead of actual damages and profits, an award of statutory damages . . . in a sum of not less than $750 or more than $30,000 as the court considers just."  17 U.S.C. § 504(c)(1).  Where there is no evidence of actual damages and the copyright owner has established infringement under the Act, an award of statutory damages is mandatory. F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 234 (1952).  Although mandatory, the "court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima."  Int'l Korwin, 855 F.2d at 383 (citations omitted).

In awarding damages, courts are guided by the principle that "defendants who violate the copyright laws must be put on notice that it costs less to obey the copyright laws than to violate them." Hickory Grove, 749 F. Supp. at 1040 (citations omitted).  Courts normally consider the expenses saved by the infringer in failing to pay licensing fees and the infringer's state of mind, whether willful and knowing or merely innocent, in determining statutory damages.  Int'l Korwin, 855 F.2d at 383; Major Bob Music v. Stubbs, 851 F. Supp. 475, 481 (S.D. Ga. 1994); M.L.E. Music, 2008 WL 2358979, at * 5.

28

Here, Plaintiffs seek statutory damages of at least $90,000, $15,000 per infringement. Plaintiffs contend the amount is "appropriate in light of the $48,283.00 in license fees 'saved' by the Defendants, plus the $636.59 in investigative costs incurred by Plaintiffs in establishing the infringing activity of the Defendants." (Doc. # 39 at 22.) Plaintiffs have offered ample evidence in support of these figures, including the affidavit of ASCAP's litigation manager Douglas Jones, billing invoices sent to TBD by ASCAP for the period in question, and bills submitted by ASCAP's investigator. (Doc. # 45, Ex. A.)

Defendants dispute Plaintiffs' calculation of license fees saved and contend the amount was less than $1,000 per season. (Doc. # 50 at 16.) This argument is based on Defendants' assertion that ASCAP's licensing documents indicate that a licensing fee is due only for live race days on which an admission fee is charged. This contention is inaccurate, however, because ASCAP's Rate Schedule actually states that licensing fees are charged for each "racing date," which is defined as a "racing session for which separate admission is charged or separate entry is required." (Doc. # 45-2 at 15.) TBD was fully aware that ASCAP considered each date on which simulcast viewing of races was available as a

29

separate "race session," because each and every invoice that
ASCAP sent to TBD reflected a $30 per day charge for
"simulcasting dates."  (See e.g. id. at 33.)  Thus, in the
absence of any evidence to the contrary, the Court accepts as
true Plaintiffs' statement as to unpaid licensing fees.

In keeping with the principle of awarding statutory
damages to deter wrongful conduct, courts often award damages
based on some multiple of unpaid licensing fees.  M.L.E.
Music, 2008 WL 2358979, at * 5.  Awards of two to three times
what the infringer would have paid for licensing fees are
common.  See e.g. Hickory Grove, 855 F.2d at 383 (finding that
the district court's award of approximately three times the
cost of a properly purchased license was appropriate to deter
future violations); M.L.E. Music, 2008 WL 2358979, at * 5
(awarding three times the amount of unpaid licensing fees in
statutory damages); Nick-O-Val Music, 656 F. Supp. at 829
(awarding $50,000 in damages where defendants saved
approximately $22,000 in licensing fees); Blue Seas Music, 831
F. Supp. at 866 (awarding almost four times the unpaid
licensing fees in statutory damages); U.S. Songs, 771 F.
Supp. at 1229 (awarding $7,500 in damages where unpaid
licensing fees totaled approximately $2,300).

30

In this case, ASCAP had put Defendants on notice as to their infringing activity, had repeatedly asked them to comply with copyright laws and enter a licensing agreement, and had warned them of the consequences of their failure to comply. In addition, the requested damages fall squarely within those allowed under § 504.  Accordingly, the Court awards Plaintiffs statutory damages in the amount of $15,000 per infringement, or $90,000.

**B.   Thayer and Cassanese's Summary Judgment Motion**

Having established TBD's liability for copyright infringement, the Court must now determine Thayer and Cassanese's individual liability for such infringement.   An individual may be held vicariously liable for the infringing conduct of a corporation if they "(1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials."[4]  Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 513 (4th Cir. 2002); Gordon v. Nextel Comm'ns & Mullen Advertising, Inc., 345 F.3d

---

[4] While Defendants argue in their summary judgment motion that they are not liable under theories of vicarious liability or contributory liability, Plaintiffs state that they are not seeking to hold Thayer or Cassanese liable as contributory infringers.   (Doc. # 49 at 2 n. 1.)   Thus, the Court will limit its analysis to the issue of vicarious liability.

922, 925 (6th Cir. 2003).  "[T]he imposition of vicarious liability for copyright infringement on a controlling individual is premised on the belief that such a person is in a position to control the conduct of the 'primary' infringer." <u>Chi-Boy Music v. Towne Tavern, Inc.</u>, 779 F. Supp. 527, 530 (N.D. Ala. 1991).  Defendants do not dispute that they each had a financial interest in the activities giving rise to the infringement.[5]

As to the right and ability to supervise, the undisputed facts demonstrate that Thayer, as President of TBD, had the requisite right and ability to supervise TBD's infringing conduct.  In her response to Plaintiffs' request for admissions, Thayer admitted that at all relevant times she "had primary responsibility for the control, management, operation and maintenance of the affairs of the corporation, including the direction and supervision of the employees at Tampa Bay Downs and the determination of the music policy

---

[5] Even if they were to dispute this element, the record clearly indicates that Thayer and Cassanese had a financial interest in the television broadcasts and the Kids and Family Day event.  Thayer and Cassanese admitted that they derived financial benefit from the operations of Tampa Bay Downs in their responses to Plaintiffs' request for admissions.  (Doc. # 39-2, Ex. 2 at ¶ 15, Ex. 3 at ¶ 15, Ex. 5 at ¶ 15, Ex. 6 at ¶ 15.)

employed at that establishment." (Doc. # 39-2, Ex. 2 at ¶ 12; Ex. 5 at ¶ 12.)

"A common theme running through the cases discussing right and ability to control is whether the defendant showed a high level of actual involvement in corporate operations that led to the infringement." WB Music Corp. v. Once and For All, Inc., Case No. 2:06-cv-282TC, 2008 WL 2381732, at * 4 (D. Utah 2008) (citing Polygram Int'l, 855 F. Supp. at 1328); see also Nick-O-Val Music, F. Supp. at 828 (noting that "an individual who is the dominant influence in a corporation and has the capacity to control the acts of that corporation may be held jointly liable . . . even in the absence of the individual's actual knowledge that the infringements occurred"). Corporate representative Berube attested during his deposition that Thayer had the authority to prevent any hired disc jockeys from broadcasting on the grounds of TBD and to restrict access to all televisions at TBD. (Doc. # 56 at 53:1-10.) Thayer was also fully aware of the alleged infringement, as at least six of ASCAP's warning letters were addressed to Thayer. (Doc. # 39-3 at 1, 12, 18; Doc. # 39-4 at 5, 13, 18.)

Based on her level of involvement and control, the Court finds Thayer individually liable for the infringements of TBD.

33

The evidence in relation to Cassanese's right and ability to control the infringing activities is not as persuasive, however.

Although Cassanese has testified that he, like Thayer, "had primary responsibility for the control, management, operation and maintenance of the affairs of the corporation, including the direction and supervision of the employees at Tampa Bay Downs and the determination of the music policy employed at that establishment," evidence of his ability to directly control the infringements at issue is lacking. (Doc. # 39-2, Ex. 3 at ¶ 12; Ex. 6 at ¶ 12.) Berube testified at his deposition that Cassanese's role as vice president of operations is primarily limited to the racing side of TBD's operations (Doc. # 56 at 23:16-24:8), and that Cassanese did not have the authority to control Radio Disney's performance at the race track. (Id. at 63:2-15.) In addition, Cassanese is not an owner of the corporation. (Id. at 23:23-24:2.)

Margo Flynn, vice president of publicity, as opposed to Cassanese, was responsible for overseeing the details of Kids and Family Day. (Id. at 22:7-23:1-2.) According to Berube, Cassanese had no oversight of Flynn regarding these events. (Id. at 24:3-5.) Furthermore, ASCAP's letters regarding TBD's failure to obtain proper licensing were directed to Flynn,

34

along with Thayer, and not to Cassanese. (Doc. # 45-3, Ex. A at 18.) This suggests that Cassanese was without authority to control the infringing conduct.

Defendants argue that, "As a corporate officer with responsibility for racing services and general maintenance of [TBD] . . . Mr. Cassanese was 'sufficiently involved in the day-to-day operation of the company'" to establish that he had the right and ability to control TBD's actions. (Doc. # 49 at 5 (citation omitted).) The Court disagrees. The evidence in the record does not establish that Cassanese had the ability to control the infringing activities. Defendants have failed to raise a genuine issue of material fact as to Cassanese's individual liability for copyright infringement.

Thus, the Court denies Defendants' motion for summary judgment as to Thayer's individual liability and grants the motion as to Cassanese's individual liability for the established infringements.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiffs' Motion for Summary Judgment against Defendants (Doc. # 39) is **GRANTED** as to Defendants Tampa Bay Downs, Inc. and Stella F. Thayer, but **DENIED** as to Defendant Robert L. Cassanese.

(2)   Defendants Stella Thayer and Robert Cassanese's Motion for Summary Judgment (Doc. # 46) is **GRANTED** as to Robert Cassanese and **DENIED** as to Stella Thayer.

(3)   Defendants Tampa Bay Downs, Inc., and Stella F. Thayer are found jointly and severally liable for six counts of copyright infringement.  The Clerk is directed to enter judgment in favor of Plaintiffs and against Defendants Tampa Bay Downs and Stella Thayer in the amount of $90,000 in damages.

(4)   Defendants are hereby enjoined and restrained permanently, either alone or in concert with others, from publicly performing any and all of the copyrighted musical compositions in the ASCAP repertory, including those belonging to Plaintiffs, and from causing or permitting such compositions to be publicly performed at the establishment known as Tampa Bay Downs, located in Tampa, Florida, or at any other facility owned, operated or conducted by the Defendants, in whole or in part, and from aiding and abetting public performances of such compositions, unless Defendants shall have previously obtained permission to give such performances either directly from the Plaintiffs or the copyright owners whose compositions are being performed or by license from

36

ASCAP.   The Court retains jurisdiction over this action to enforce the terms of this permanent injunction.

(5)   The Court further retains jurisdiction to consider a motion for an award of attorney's fees and costs to be submitted within fourteen (14) days of the date of this order.

(6)   This case remains open as to the third party claims asserted by Defendants against Radio Disney Group, LLC.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>6th</u> day of January 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

copies to:

All counsel of record